**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JOHN WORMAN,

        Defendant.

No. CR 08-3012-MWB

**MEMORANDUM OPINION AND ORDER REGARDING PROSECUTION'S PRE-TRIAL EVIDENTIARY MOTIONS**

FILED UNDER SEAL

---

**TABLE OF CONTENTS**

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   **A. Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   **B. Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   **A. Identification Of Torkelson As "The Victim"** . . . . . . . . . . . . . . . . 7
   **B. Evidence Of Defendant's Poor Workplace Behavior** . . . . . . . . . . . . 12
       **1.**    **Additional factual background** . . . . . . . . . . . . . . . . . . . . 13
       **2.**    **Arguments of the parties** . . . . . . . . . . . . . . . . . . . . . 13
       **3.**    **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           **a.**    **Admissibility as "inextricably intertwined" evidence** . . 15
           **b.**    **Admissibility as Rule 404(b) evidence** . . . . . . . . . . . 19
           **c.**    **Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   **C. Evidence Of Torkelson's Extramarital Affairs** . . . . . . . . . . . . . . . 24
       **1.**    **Additional factual background** . . . . . . . . . . . . . . . . . . . . 24
       **2.**    **Arguments of the parties** . . . . . . . . . . . . . . . . . . . . . 25
       **3.**    **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  **D.** **Evidence That Mrs. Worman Blamed Torkelson For Worman's Termination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    **1.** **Additional factual background** . . . . . . . . . . . . . . . . . . . . . 33
    **2.** **Arguments of the parties** . . . . . . . . . . . . . . . . . . . . . . . 34
    **3.** **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## I. INTRODUCTION

### A. Procedural Background

This case arises from the mailing, on June 29, 2005, of a package addressed to Paulette Torkelson that contained a pipe bomb inside an antique radio. On April 9, 2008, a Grand Jury handed down the original Indictment in this matter, charging defendant John Worman, who had worked with Torkelson some twelve years earlier and purportedly blamed her for the loss of his job, with mailing non-mailable matter with intent to kill or injure another in violation of 18 U.S.C. § 1716. The original Indictment has been twice superseded, first on May 8, 2008 (docket no. 11), to add charges pursuant to 26 U.S.C. § 5845 and 18 U.S.C. § 844(d), then again on August 6, 2008 (docket no. 26), to add an additional charge pursuant to 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii).

Thus, the charges currently pending against Worman, pursuant to the Second Superseding Indictment, are the following: **Count 1**, a "mailing non-mailable matter" offense in violation of 18 U.S.C. §§ 2 and 1716, charges that, on or about June 29, 2005, defendant Worman knowingly deposited and caused to be deposited at the Post Office located in Renwick, Iowa, for mailing and delivery, a stamped and addressed package containing an explosive, inflammable material, an infernal machine, a device which may

ignite or explode, and material which may kill or injure another, which constitutes non-mailable matter, with intent to kill or injure another; **Count 2**, a "possession of an unregistered destructive device" offense in violation of 26 U.S.C. §§ 5861(d), 5845(f), and 5871, charges that, on or about June 29, 2005, defendant Worman knowingly and unlawfully possessed a firearm, that is, a combination of parts either designed or intended for use in converting any device into a destructive device, specifically, a pipe bomb, which was not registered to Worman in the National Firearms Registration and Transfer Record; **Count 3**, an "interstate transportation of an explosive device" offense in violation of 18 U.S.C. § 844(d), charges that, on or about June 29, 2005, defendant Worman transported and attempted to transport in interstate commerce an explosive device, that is, a pipe bomb, with knowledge that the explosive would be used to kill, injure, or intimidate a person, or to unlawfully damage or destroy a building, vehicle, or other real or personal property; and, finally, **Count 4**, a "using, carrying, or possessing a destructive device" offense in violation of 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii), charges that, on or about June 29, 2005, defendant Worman knowingly (a) used and carried a destructive device, that is, a pipe bomb, during and in relation to a crime of violence, including the crimes charged in Counts 1 and 3: and (b) possessed a destructive device, that is, a pipe bomb, in furtherance of a crime of violence, including the crimes charged in Counts 1 and 3. Trial in this matter is currently set for a date certain of October 27, 2008.

In anticipation of trial, but before the Second Superseding Indictment was handed down on August 6, 2008, the prosecution filed three evidentiary motions, which are now before the court. Those motions, all filed under seal, are the following: (1) the prosecution's July 24, 2008, Motion For Pretrial Determination Of Admissibility Of Evidence Regarding Defendant's Prior Conduct (docket no. 21); (2) the prosecution's August 5, 2008, Motion In Limine Regarding Paulette Torkelson's Extramarital Affairs

(docket no. 24); and (3) the prosecution's August 6, 2008, Motion In Limine To Admit Statements By Witnesses That Shirley Worman Blamed Paulette Torkelson For Defendant's Termination From Winnebago (docket no. 25). After an extension of time to do so, defendant Worman filed a combined Resistance To Government's Motions In Limine And For Pretrial Determinations Of Admissibility Of Evidence (docket no. 34), also under seal, on September 2, 2008. The prosecution then filed a combined Reply (docket no. 38) on September 11, 2008.

Before turning to a seriatim analysis of these motions and an additional issue raised in Worman's resistance, the court will provide a general factual background gleaned from the parties' briefs.[1] For each motion, the court will also identify any additional facts that the parties assert and that the court finds to be relevant to the disposition of that motion.

---

[1] Contrary to what appears to be a common belief among attorneys in criminal cases, the court does not live in the discovery file for each case. Indeed, prior to trial, the court has little or no access to the evidence in the case apart from what the parties may present in support of or resistance to a motion to suppress or a pretrial evidentiary motion. Thus, it is critical that the parties adequately identify—and where possible provide the court with—the evidence that is at issue in a pretrial evidentiary motion. This court has, with some regularity, denied or reserved for trial ruling on pretrial evidentiary motions where the parties did not identify the evidence at issue sufficiently for the court to make a pretrial determination of admissibility. Here, the court has had to piece together a general factual background from the parties' submissions. Also, although the parties, and particularly the prosecution, have, for the most part, adequately identified the evidence at issue and the factual context of particular evidentiary disputes for the court to determine pretrial the admissibility of the evidence at issue, the court has not necessarily been able to do so for all evidence or to assess admissibility of evidence on all of the grounds asserted.

### B. Factual Background

Defendant Worman was employed at Winnebago Industries, Inc., in Forest City, Iowa, for eighteen years. At some point, he became a supervisor. The prosecution contends that, in 1993, Paulette Torkelson, who was then Worman's supervisor, had criticized Worman because he "bullied" employees who worked under him and, when Torkelson conducted Worman's annual performance review that year, she discussed with him his poor interpersonal skills, including his temper and expressions of anger at his co-workers. The parties agree that, also in 1993, Worman attended a meeting with Torkelson and Larry Kluckhorn, the director of personnel for Winnebago, at which the prosecution contends that the participants discussed Worman's anger and temper. Worman contends that, at the meeting, Kluckhorn informed Worman that he was going to be demoted or "broken down" to lead man. Worman asserts that Kluckhorn gave him three days off to decide whether to accept demotion to an hourly wage position or to accept a severance package and leave Winnebago's employment. Worman contends that he could have returned to work at Winnebago in a different location under a different supervisor, so that he could have avoided further contact with Torkelson, but that he chose to leave Winnebago. The prosecution has described Worman's termination from Winnebago at various times as a "firing" and as a "resignation," but Worman contends that he "resigned." The parties also dispute whether Worman was hostile during the meeting with Kluckhorn and Torkelson, as the prosecution contends, or whether he was calm about leaving Winnebago, as Worman contends. Worman contends that he did not speak to Torkelson after 1993 and that he has had only about five incidental contacts with Torkelson in the last fifteen years.

The prosecution contends that, in about 1999, Worman secured a contract to build certain metal racks for Winnebago. Worman explains that the business of building racks

for Winnebago was actually through other entities, J & S Manufacturing, which was the company Worman worked for, and Schrock, Inc. The prosecution contends that the contract to build racks for Winnebago became Worman's principal source of income. Worman contends that there was never any contract between J & S Manufacturing and Schrock, Inc., or between J & S Manufacturing and Winnebago Industries, or between himself and Schrock or Winnebago. Nevertheless, he does admit that he manufactured racks for J & S Manufacturing that were used by Schrock and Winnebago. The prosecution contends that, after Worman had been supplying racks for several years, Worman's "lucrative" "contract" was "canceled" when Torkelson found out about it and "reported" it to management. Worman contends, however, that J & S's business was never "lucrative" and that it is unclear to him how Torkelson could have interfered with his business relationship with either Schrock, Inc., or Winnebago, particularly when Torkelson had little authority at Winnebago in 2004 or 2005 when the "contract" was supposedly "canceled." Worman asserts that the failure of J & S's business was attributable to economic forces generally, not to any interference by Torkelson. Although the prosecution contends that Worman blamed Torkelson for both his termination from Winnebago and his later loss of his business building racks for Winnebago, Worman denies that he blames Torkelson for either event.

On June 29, 2005, some twelve years after Worman's employment with Winnebago ended, someone placed in the United States Mail at the Post Office in Renwick, Iowa, a package addressed to Paulette Torkelson that contained a pipe bomb inside an antique radio. The parties apparently agree that the use of an antique radio suggests that the would-be bomber knew of Torkelson's fondness for antiques. Worman contends that the evidence in the discovery file does not demonstrate that the pipe bomb had an igniter and, thus, whether it was capable of exploding, or was only intended as some kind of

"message" to Torkelson. It appears that the package was intercepted by postal inspectors, never delivered to Torkelson, never unexpectedly detonated, and never injured anyone. Worman is charged with sending the bomb to Torkelson. The prosecution's theory appears to be that Worman sent the bomb, because he blamed Torkelson for the loss of his job at Winnebago and the subsequent loss of his business building racks for Winnebago. Worman denies that he had anything to do with sending the pipe bomb to Torkelson and denies that he blames her for anything.

## II. LEGAL ANALYSIS

### A. Identification Of Torkelson As "The Victim"

The court begins its analysis of evidentiary issues with one that Worman only raised in passing, not in a formal motion in limine. In his Resistance, Worman points out, and the court finds, that throughout the prosecution's briefs on its pretrial evidentiary motions, the prosecution refers to Paulette Torkelson as "the victim." Worman contends, however, that there was no "victim" in this case, because no one was hurt, no one was injured, and no one was threatened. Thus, Torkelson, at least implicitly, asks the court to preclude the prosecution or any witnesses from referring to Torkelson as "the victim" of the alleged crimes charged in this case.

The court will assume, without deciding, that the descriptive term for a person that a witness or a prosecutor may use is, in some sense, "evidence."[2] "Evidence" or not, the

_____

[2]The court has been unable to find any federal cases addressing directly the question of whether describing someone as "the victim" of an alleged crime is admissible or inadmissible "evidence," although the court has found one case in which a defendant asserted that the prosecutor improperly referred to someone as "the victim," *see Johnson v. Quarterman*, 2007 WL 1886277, *1-*2 (S.D. Tex. June 29, 2007) (the defendant's

(continued...)

court finds that such descriptive terms certainly can have prejudicial power, because of their potential impact upon jurors' perceptions of the person so described. Thus, whether or not the court should allow the prosecution or any witness to refer to Torkelson as "the victim" of any of the illegal conduct alleged in this case comes down to whether such a description is relevant, and if so, whether it is so inherently inaccurate or prejudicial that it should nevertheless be barred.

More specifically, Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 provides that relevant evidence is generally admissible, but irrelevant evidence is not. Rule 403 provides for exclusion of even relevant evidence on various grounds, as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED. R. EVID. 403. As the Eighth Circuit Court of Appeals has recently explained,

> Under Rule 403, district courts have broad discretion to assess unfair prejudice, and are reversed only for an abuse of

---

[2](...continued)

claim, on a petition for *habeas corpus* pursuant to 28 U.S.C. §§ 2241 and 2254, that he had suffered a fundamental miscarriage of justice when the prosecutor improperly referred to the complainant as the "victim" was procedurally barred from review), and one case in which a defendant asserted that his counsel had been ineffective for failing to move the court to exclude use of the term "the victim," *see Coy v. Quarterman*, 2007 WL 1729877, *4-*6 (S.D. Tex. June 13, 2007) (finding that counsel had made a permissible strategic decision not to object to references to "the victim").

> discretion. *United States v. Henderson*, 416 F.3d 686, 693
> (8th Cir. 2005), *cert. denied*, 546 U.S. 1175, 126 S. Ct. 1343,
> 164 L. Ed. 2d 57 (2006). Rule 403 "does not offer protection
> against evidence that is merely prejudicial in the sense of being
> detrimental to a party's case. The rule protects against
> evidence that is unfairly prejudicial, that is, if it tends to
> suggest decision on an improper basis." *Wade v. Haynes*, 663
> F.2d 778, 783 (8th Cir. 1981), *aff'd sub nom. Smith v. Wade*,
> 461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).

*United States v. Myers*, 503 F.3d 676, 681 (8th Cir. 2007); *United States v. Farrington*, 499 F.3d 854, 858-59 (8th Cir. 2007). The Advisory Committee Notes to Rule 403 explain that a decision on an "improper basis" is "commonly, though not necessarily, an emotional one." FED. R. EVID. 403, Advisory Committee Notes; *see also United States v. Jiminez*, 487 F.3d 1140, 1145 (8th Cir. 2007) (quoting this note); *United States v. Dierling*, 131 F.3d 722, 730-31 (8th Cir. 1997) (considering whether evidence was unfairly prejudicial, because it might lead to a decision on an improper basis, where it purportedly had no connection to the charged offense and revealed grisly or violent behavior that made the defendant appear "dangerous"). Unfairly prejudicial evidence has also been described as evidence that is "'so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.'" *United States v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005) (quoting *United States v. Shoffner*, 71 F.3d 1429, 1433 (8th Cir. 1995)).

The court finds, first, that describing Torkelson as "the victim" in this case has no more than marginal relevance or probative value. The court doubts that describing Torkelson as "the victim" will have any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *See* FED. R. EVID. 401 (defining relevant evidence). The

charges in this case do not require proof that any person was actually killed or injured, or that any property was actually damaged. Moreover, Worman is correct that Torkelson never received the pipe bomb, neither Torkelson nor anyone else was injured or killed by it, nor was any property damaged by it. To that extent, describing Torkelson as "the victim" is neither accurate nor probative of any element that the prosecution must prove. To that extent, then, describing Torkelson as "the victim" of the illegal conduct at issue is not relevant within the meaning of Rule 401 and, thus, is not admissible under Rule 402.

The prosecution might argue that Torkelson was *threatened* by the pipe bomb, even though she never received it, because she did learn that it had been sent to her, and in that sense, she is a "victim" of the criminal conduct at issue. **Count 3** does charge, as an alternative for the *mens rea* requirement, that the explosive device was transported with knowledge that it would be used to "intimidate a person." Thus, a person who was intimidated or threatened by the transportation of the explosive device is, in some sense, a "victim" of the illegal conduct. This is true whether or not the explosive device was actually delivered to the "victim," because the threat would arise simply from the "victim's" knowledge that the explosive device had been sent to her. To that extent, then, describing Torkelson as "the victim" of conduct intended to threaten or intimidate her is relevant under Rule 401 and, thus, is admissible under Rule 402. Even so, the court deems the *description* of Torkelson as a "victim" to be no more than marginally relevant to proving the defendant's *knowledge* that the explosive device would be used to intimidate someone, which is the fact of consequence to the determination of the action. *See* FED. R. EVID. 401 (defining relevance in terms of whether the evidence makes the existence of any fact that is of consequence to the determination of the action more or less probable).

On the other hand, the court notes that **Count 1** charges that non-mailable matter was mailed "with intent to kill or injure another," in violation of 18 U.S.C. § 1716, and

that **Count 3** charges that the destructive device was transported "with knowledge that the explosive would be used to kill, injure, or intimidate a person, or to unlawfully damage or destroy a building, vehicle, or other real or personal property," in violation of 18 U.S.C. § 844(d). Thus, some *potential* "victim" must have been *intended* or *known about* to prove the illegal conduct at issue in these two Counts. The court also notes that there appears to be no dispute that the pipe bomb in question was addressed to Torkelson so that she was the "intended victim," "intended recipient," or "target" that the prosecution must identify to prove the illegal conduct at issue in **Counts 1** and **3**. Thus, these descriptions are relevant under Rule 401, and are admissible under Rule 402.

Turning to the balancing required by Rule 403, the court finds that, even if describing Torkelson as "the victim" has any probative value, describing Torkelson as "the victim" would be inflammatory, in that it might encourage jurors to decide the charges against Worman based on an emotional response to supposed "victimization" of Torkelson, rather than on the basis of evidence showing that Worman was actually involved in sending the pipe bomb to Torkelson. *See, e.g.,* FED. R. EVID. 403, Advisory Committee Notes (describing decision on an "improper basis" as "commonly, though not necessarily, an emotional one"); *Adams*, 401 F.3d at 900 (describing unfairly prejudicial evidence as evidence that is "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.") (internal quotation marks and citations omitted). "Victim" is a particularly emotionally "loaded" word. The court finds that such potential prejudice outweighs whatever marginal relevance or probative value there may be to describing Torkelson as "the victim." Similarly, while "intended victim" has some probative value here and somewhat mitigates the inflammatory impact of "victim," standing alone, the court finds that such a phrase still carries with it sufficient prejudicial impact, where "victim" is a "loaded" word, that the phrase "intended victim" should also be excluded.

The results of the Rule 403 balancing test are different, however, as to describing Torkelson as the "intended recipient" or "target" of the pipe bomb. As explained above, describing Torkelson in these ways is probative of the "intent" and "knowledge" elements of the charges in **Counts 1** and **3**. Such descriptions also do not have the same potential for unfair prejudice that "the victim" does, in part because such descriptions are accurate, where Torkelson was the addressee of the pipe bomb, and they simply do not have the same inflammatory impact that can be attributed to "the victim."

Therefore, the court holds, *sua sponte*, that neither the parties nor any witnesses may refer to or describe Torkelson as "the victim" or "the intended victim," although the parties and the witnesses may refer to Torkelson as "the intended recipient" or "the target" of the pipe bomb at issue in this case.

The court now turns to evidentiary issues specifically raised by the prosecution in its pretrial evidentiary motions.

## B. Evidence Of Defendant's Poor Workplace Behavior

In its July 24, 2008, Motion For Pretrial Determination Of Admissibility Of Evidence Regarding Defendant's Prior Conduct (docket no. 21), the prosecution seeks pretrial determination of the admissibility of evidence concerning Worman's alleged history of interpersonal problems in the workplace, including exhibiting temper and anger toward co-workers. Worman opposes admission of such evidence. The court's analysis of this evidentiary motion begins with a brief recitation of some additional factual background.

### 1.    *Additional factual background*

The prosecution contends that Worman was demoted and fired because of his behavior toward his co-workers.  The prosecution contends that Larry Kluckhorn, the personnel director for Winnebago, Bob Olson, a co-worker, and other employees were aware of Worman's behavior, including his poor interpersonal skills, temper, and expressions of anger, and that Olson will testify that Torkelson was the person who was required by company policy to address those problems with Worman.  Worman contends that, in his position as a supervisor, he was required to follow company policies, but that when he did so, he was accused of being "too tough" on hourly employees who worked under him.  He also disputes that his behavior was ever hostile, angry, or vengeful.

### 2.    *Arguments of the parties*

The prosecution contends, first, that evidence of "bad acts" is admissible, without reference to Rule 404(b), if it is inextricably intertwined as an integral part of the immediate context of the crime charged.  Here, the prosecution contends that evidence that Worman acted with anger and a short temper toward his co-workers explains the circumstances leading to the animosity he held toward his supervisor, Torkelson, the intended recipient of the pipe bomb in this case.  The prosecution also contends that such evidence explains why Torkelson took action against Worman, leading to his demotion and firing.  Thus, the prosecution argues that such evidence is part of the immediate context of the crime.

Next, the prosecution argues that this evidence is admissible pursuant to Rule 404(b) as "other acts" evidence proving motive and intent.  The prosecution argues that the "other acts" to which Rule 404(b) applies do not have to be "other crimes."  Here, the prosecution argues that evidence of Worman's poor workplace behavior and its consequences demonstrates Worman's motive for later sending a pipe bomb to Torkelson

and also goes to his intent to kill or injure, an element of the § 1716 offense in **Count 1**. The prosecution also argues that such evidence is not being used simply to show a general characteristic of anger. More specifically, the prosecution argues that such evidence satisfies the four-prong test for admissibility under Rule 404(b) employed in this circuit. First, the prosecution argues that the evidence is relevant to motive and intent. Second, the prosecution argues that the evidence is sufficiently similar in kind, in that it demonstrates Worman's hostility toward workers at his former workplace and that he blamed them for his problems, and sufficiently close in time, because there is no absolute rule about the number of years that can separate the events at issue, and where, as here, the victim of the bad acts is the same, the twelve years that separate the workplace conduct from the charged crimes does not make the workplace evidence inadmissible. Third, the prosecution also argues that it has sufficient evidence from former co-workers of Worman's workplace behavior. Finally, the prosecution argues that the possible prejudice from such evidence does not substantially outweigh its probative value, where the evidence at issue, standing alone, is not likely to lure the jury into convicting Worman.

Worman argues that such evidence is inadmissible. Worman argues that such evidence is not inextricably intertwined with evidence of the alleged crimes, because such evidence does not complete the story or provide a total picture of the crimes charged. Rather, Worman points to what he describes as a "gaping hole" of twelve years between his workplace conduct and the mailing of the pipe bomb. He points out that there is no evidence of a continuing relationship or continuing antagonism between himself and Torkelson, nor is there any evidence that he had some continuing plan to hurt Torkelson to connect the workplace conduct to the criminal conduct at issue in this case.

Worman also argues that such evidence is not admissible pursuant to Rule 404(b). He argues that evidence of poor workplace behavior is not relevant, because it does not

reveal either criminal conduct or bad acts. He also argues that the workplace conduct is not similar in kind or close in time to the mailing of a pipe bomb. He points out that there is no similarity of plan or conduct, that there is a twelve-year gap between the events, and that there is no evidence of a continuing violent relationship. Next, Worman argues that there is insufficient evidence of poor workplace behavior, but plenty of evidence of his acceptable work performance prior to 1993. Finally, without conceding that such evidence has any probative value, Worman argues that any probative value such evidence may have is outweighed by its potential for prejudice, because of the likelihood of a "trial within a trial," as the prosecution will attempt to show his "temper" in the workplace, and he will counter with evidence of his calm behavior upon his departure from Winnebago and other evidence about or explaining his workplace conduct.

In reply, the prosecution argues that Worman is improperly trying to import a "close in time and similar in kind" requirement from Rule 404(b) into the "inextricably intertwined" evidence analysis. The prosecution also argues that other acts evidence pursuant to Rule 404(b) need only meet a preponderance of the evidence standard, not a clear and convincing standard, as Worman asserts, to be admissible. The prosecution also asserts that, for evidence to be barred by Rule 403, the potential for prejudice or confusion from such evidence must "substantially" outweigh its probative value, which is not the case as to this evidence.

### 3. Analysis

#### a. Admissibility as "inextricably intertwined" evidence

As the Eighth Circuit Court of Appeals has explained, "One of the exceptions to the general rule that evidence of other crimes committed by a defendant is inadmissible is when the proof provides the context in which the charged crime occurred—'the res

gestae.'" *United States v. Fleck*, 413 F.3d 883, 890 (8th Cir. 2005) (citing *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984)). More specifically,

> [The Eighth Circuit Court of Appeals has] held that Rule 404(b), which governs the admission into evidence of wrongful conduct other than the conduct at issue, applies "only to 'extrinsic' and not to 'intrinsic' evidence." *United States v. Swinton*, 75 F.3d 374, 377 (8th Cir. 1996). Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred. *United States v. Forcelle*, 86 F.3d 838, 842 (8th Cir. 1996). Such evidence is admitted because "the other crime evidence 'completes the story' or provides a 'total picture' of the charged crime." *Id.*

*United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006). However, "'[i]n those cases in which [the Eighth Circuit Court of Appeals has] approved the use of other crimes evidence as an integral part of the context of the crime charged, the other crime evidence was closely or inextricably intertwined with the charged crime.'" *Fleck*, 413 F.3d at 890 (quoting *United States v. Forcelle*, 86 F.3d 838, 842 (8th Cir. 1996)). To put it a different way, "'crimes or acts which are "inextricably intertwined" with the charged crime are not extrinsic and Rule 404(b) does not apply.'" *United States v. Adams*, 401 F.3d 886, 899 (8th Cir. 2005) (quoting *United States v. O'Dell*, 204 F.3d 829, 833 (8th Cir. 2000)).

The Eighth Circuit Court of Appeals has required that the evidence of conduct that is purportedly "inextricably intertwined" with the charged crime must do more than simply explain circumstances surrounding the alleged crime, if it has "nothing to do with" the commission of the charged crime; rather, it must "'complete[] the story or provide[] a total picture *of the charged crime*.'" *Fleck*, 413 F.3d at 890 (quoting *United States v. Forcelle*, 86 F.3d 838, 842 (8th Cir. 1996), with emphasis added by the *Fleck* court) (rejecting evidence of another crime that merely explained why the police were at the Fleck home).

Thus, only "'when evidence of other crimes is so blended or connected, with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged.'" *Id.* (again quoting *Forcelle*, 86 F.3d at 841, with quotations omitted). Such evidence is also "subject to the dictates of Rule 403, which requires that the probative value of evidence is not substantially outweighed by the danger of unfair prejudice." *Adams*, 401 F.3d at 899 (explaining that Rule 403 applies to evidence either within or without the scope of Rule 404(b), including "intrinsic" or "inextricably intertwined" evidence).

Here, it is the prosecution's *theory* that Worman's temperamental relationship with his co-workers and his supposed hostility toward Torkelson, arising from the termination of his employment with Winnebago because of poor workplace conduct, explains why Worman would send Torkelson a pipe bomb twelve years later. Thus, from the prosecution's perspective, the evidence in question is "an integral part of the context of the crime charged," and does "explain[] the circumstances," "complete[] the story," or "provide[] a total picture *of the charged crime*." *Fleck*, 413 F.3d at 890 (emphasis in the original; internal quotation marks and citation omitted). The court finds, however, that the line between admissible "intrinsic" evidence and inadmissible evidence in this case must be more carefully drawn.

Evidence of Worman's relationship *with Torkelson*—and more specifically, any evidence of angry, hostile, or temperamental interactions *with Torkelson* or evidence of Torkelson's involvement in Worman's termination—would be "inextricably intertwined" with the crimes charged in this case, because such evidence would be "an integral part of the context of the crime charged," and would "explain[] the circumstances," "complete[] the story," or "provide[] a total picture *of the charged crime*" by showing the relationship

17

between the alleged perpetrator and the intended target of the pipe bombing. *Id.* Such evidence of Worman's workplace conduct *towards other co-workers or supervisors*, on the other hand, is not "inextricably intertwined" with the crimes charged, where there is no allegation—and no evidence has been brought to the court's attention—that any other Winnebago employees, or Winnebago and its employees more generally, were targets of the pipe bomb in this case. Evidence of Worman's workplace conduct toward other co-workers or supervisors simply has nothing to do with the commission of the charged crimes. *Cf. id.* (evidence explaining why the police were at the Fleck home did not explain the context of, and had nothing to do with, the commission of the charged crime, and therefore, was not "inextricably intertwined" with the charged crime).

Moreover, only evidence of any angry, hostile, or temperamental interactions *between Worman and Torkelson* or Torkelson's involvement with Worman's termination satisfies Rule 403's balance of probative value against potential for prejudice. *See Adams*, 401 F.3d at 899 (explaining that Rule 403 applies to evidence either within or without the scope of Rule 404(b), including "intrinsic" or "inextricably intertwined" evidence). The court agrees with the prosecution that such evidence is probative of whether Worman would send Torkelson a pipe bomb twelve years later, specifically, whether he would have any motive or intent to do such a thing, and is not unfairly prejudicial, nor will it require a "trial within a trial," as Worman contends, because such evidence will be properly limited. *See* FED. R. EVID. 403 (allowing exclusion of relevant evidence, if its probative value is outweighed, *inter alia*, by the potential for unfair prejudice or undue delay). In the court's view, the twelve-year "gap" between the workplace interactions with Torkelson and the bombing, to which Worman points goes to the *weight* of the evidence, not its admissibility.

18

In contrast, even if general evidence of Worman's purported angry, hostile, or temperamental interactions with other co-workers were "intrinsic" or "inextricably intertwined" evidence of the charged crimes—and, in the court's view, such evidence has nothing to do with the charged crimes, *see Fleck*, 413 F.3d at 890 (evidence that has nothing to do with the charged crime is not "intrinsic" or "inextricably intertwined")—the potential for prejudice substantially outweighs any probative value of such evidence. Fed. R. Evid. 403; *Adams*, 401 F.3d at 899 (Rule 403 is still applicable to "intrinsic" or "inextricably intertwined" evidence). Such evidence would simply characterize Worman as a "hothead" or "angry" person, inviting the jury to convict him on that basis, instead of on the basis of evidence, if any, demonstrating that he was actually involved in the pipe bombing, and would divert the jury's attention from evidence showing (or failing to show) his actual involvement in the pipe bombing. *See, e.g.,* Fed. R. Evid. 403, Advisory Committee Notes (describing decision on an "improper basis" as "commonly, though not necessarily, an emotional one"); *Adams*, 401 F.3d at 900 (describing unfairly prejudicial evidence as evidence that is "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.") (internal quotation marks and citations omitted). Evidence regarding Worman's workplace behavior generally would also run the risk of devolving into a "mini-trial" with little relevance to the determination of the criminal charges at issue, as the parties attempt to prove or disprove that Worman's workplace behavior was frequently temperamental. *See* Fed. R. Evid. 403 (probative evidence may be excluded based on the risk of confusion of the issues, undue delay, or waste of time).

### b. *Admissibility as Rule 404(b) evidence*

The court's analysis of the admissibility of the evidence in question in the prosecution's first pretrial evidentiary motion is essentially the same under Rule 404(b), if the evidence is *not* "intrinsic" or "inextricably intertwined" evidence. Rule 404(b) of

the Federal Rules of Evidence prohibits admission of prior convictions and "bad acts" simply to show a propensity to commit a charged offense, but does permit such evidence to be admitted for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b). The Eighth Circuit Court of Appeals has explained the scope of admissibility of evidence pursuant to Rule 404(b), as follows:

> While we have interpreted Rule 404(b) to be a rule of inclusion, *see United States v. Sykes*, 977 F.2d 1242, 1246 (8th Cir. 1992), this interpretation does not give the government the unhindered ability to introduce evidence of prior crimes. Instead, the evidence of prior crimes must be 1) relevant to a material issue; 2) similar in kind and not overly remote in time to the charged crime; 3) supported by sufficient evidence; and 4) such that its potential prejudice does not substantially outweigh its probative value. *See United States v. Williams*, 308 F.3d 833, 837 (8th Cir. 2002).

*United States v. Crenshaw*, 359 F.3d 977, 998 (8th Cir. 2004); *accord United States v. Lakoskey*, 462 F.3d 965, 979-80 (8th Cir. 2006) (reiterating that Rule 404(b) is a rule of inclusion and that evidence is admissible under Rule 404(b) if it satisfies the same four-factor test), *cert. denied*, ___ U.S. ___, 127 S. Ct. 1388 (2007); *see also Clark v. Martinez*, 295 F.3d 809, 814 (8th Cir. 2002) (Rule 403 applies to evidence otherwise admissible pursuant to Rule 404(b)); *United States v. Mound*, 149 F.3d 799, 801-02 (8th Cir. 1998) (same), *cert. denied*, 525 U.S. 1089 (1999). Thus, the Eighth Circuit Court of Appeals will reverse admission of purported Rule 404(b) evidence "'only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *United States v. Marquez*, 462 F.3d 826, 830 (8th Cir. 2006) (quoting *United States v. Thomas,* 398 F.3d 1058, 1062 (8th Cir. 2005), with internal quotations omitted). On the other hand, admission of such evidence

is erroneous, for example, where the record shows that the actual use that the prosecution made of the evidence did not demonstrate that the evidence was used for a permissible purpose and the court's limiting instruction failed to mention the prosecution's ostensible purpose as a basis for considering the evidence. *Crenshaw*, 359 F.3d at 1001-02.

Evidence of Worman's purported angry, hostile, or temperamental interactions with co-workers in general fails every step, or nearly every step, of the Rule 404(b) analysis. As explained above, such evidence is not relevant to prove the charged offenses, *see Lakoskey*, 462 F.3d at 979-80 (first requirement); *Crenshaw*, 359 F.3d at 998 (same), where there is no allegation—and no evidence has been brought to the court's attention—that any Winnebago employees other than Torkelson, or Winnebago and its employees more generally, were targets of the pipe bomb in this case. Evidence of Worman's workplace conduct toward other co-workers or supervisors simply has nothing to do with the commission of the charged crimes. Such evidence also is not "similar in kind" to the charged conduct of sending a pipe bomb to a particular former co-worker. *See id.* (second requirement); *Crenshaw*, 359 F.3d at 998 (same). Even supposing that the prosecution can produce sufficient evidence of Worman's poor workplace behavior, *see id.* (third requirement); *Crenshaw*, 359 F.3d at 998 (same), such evidence fails the balancing of probative value against potential for unfair prejudice. *Id.* (fourth requirement); *Crenshaw*, 359 F.3d at 998 (same); *see also Clark*, 295 F.3d at 814 (Rule 403 applies to evidence otherwise admissible pursuant to Rule 404(b)); *Mound*, 149 F.3d at 801-02 (same). Such evidence would simply characterize Worman as a "hothead" or "angry" person, inviting the jury to convict him on that basis, instead of on the basis of evidence, if any, demonstrating that he was actually involved in the pipe bombing, and would divert the jury's attention from evidence showing (or failing to show) his actual involvement in the pipe bombing. *See, e.g.,* FED. R. EVID. 403, Advisory Committee

Notes (describing decision on an "improper basis" as "commonly, though not necessarily, an emotional one"); *Adams*, 401 F.3d at 900 (describing unfairly prejudicial evidence as evidence that is "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.") (internal quotation marks and citations omitted). Indeed, such evidence appears to the court to be a classic example of evidence that "'clearly ha[s] no bearing on the case and [would be] introduced solely to prove the defendant's [supposed] propensity to commit criminal acts,'" because he is a "hothead." *Marquez*, 462 F.3d at 830 (quoting *Thomas,* 398 F.3d at 1062, with internal quotations omitted).

Again, the analysis is different for more focused evidence of angry, hostile, or temperamental interactions between Worman and Torkelson or evidence of Torkelson's involvement with Worman's termination. First, as explained above, evidence of a hostile relationship between Worman and Torkelson and evidence of Torkelson's involvement in Worman's termination is probative of whether Worman would send Torkelson a pipe bomb twelve years later, specifically, whether he would have any motive or intent to do such a thing. *See Lakoskey*, 462 F.3d at 979-80 (first requirement); *Crenshaw*, 359 F.3d at 998 (same); *see also* FED. R. EVID. 404(b) ("bad acts" evidence may be admissible to show motive or intent). As to the second requirement, similarity in kind and closeness in time, *Lakoskey*, 462 F.3d at 979-80; *Crenshaw*, 359 F.3d at 998, the prosecution has cited cases that it argues stand for the proposition that evidence of prior hostility toward a person is sufficiently similar in kind to criminal conduct toward that person to satisfy Rule 404(b), *because* it shows intent or motive for the later criminal conduct. *See United States v. Shedlock*, 62 F.3d 214, 218-19 (8th Cir. 1995); *United States v. Gilbert*, 181 F.3d 152, 159-61 (1st Cir. 1999). The court sees no immediate similarity, in terms of conduct, between hostile interactions with a co-worker and later sending that former co-worker a pipe bomb, even if a "perfect match" is not required. *See Shedlock*, 62 F.3d at 218

(noting that a "perfect match" is not required, but nevertheless finding that two incidents in question, twenty-nine days apart, involving confronting Planned Parenthood employees, on the one hand, and confronting a Deputy United States Marshal providing security for the Planned Parenthood clinic, on the other, were "amazingly similar"). On the other hand, the motivation may be the same for hostile exchanges with a co-worker in the workplace and a later attempt to attack that former co-worker, and, in any event, the court agrees that a defendant's reaction to an earlier incident with a co-worker may be particularly probative of the defendant's motive for a later attack on that former co-worker. *Cf. Gilbert*, 161 ("We do not think that the investigation evidence [concerning unexplained deaths at a Veteran's Administration hospital] is barred by either Rule 403 or Rule 404(b). As the district court pointed out, it could be described as part of the proof that Gilbert was the one who made the telephone bomb threat [to the same VA hospital]. The jury could well have found that her reaction to the investigation as shown by what she said and did was the motive for the bomb threat. And proof of motive is one of the purposes for admitting evidence that would be otherwise excludable under Rule 404(b)."). Assuming that the prosecution can produce sufficient evidence of Worman's hostile interactions with Torkelson and of Torkelson's involvement in Worman's termination, *see id.* (third requirement); *Crenshaw*, 359 F.3d at 998 (same), such evidence satisfies the balancing of probative value against potential for unfair prejudice. *Id.* (fourth requirement); *Crenshaw*, 359 F.3d at 998 (same); *see also Clark*, 295 F.3d at 814 (Rule 403 applies to evidence otherwise admissible pursuant to Rule 404(b)); *Mound*, 149 F.3d at 801-02 (same). Again, the court agrees with the prosecution that such evidence is probative of whether Worman would send Torkelson a pipe bomb twelve years later, specifically, whether he would have any motive or intent to do such a thing. Such evidence is not unfairly prejudicial, nor will it require a "trial within a trial," as Worman contends, because such evidence will be

23

properly limited. *See* FED. R. EVID. 403 (allowing exclusion of relevant evidence, if its probative value is outweighed, *inter alia*, by the potential for unfair prejudice or undue delay). Again in the court's view, the twelve-year "gap" between the workplace interactions with Torkelson and the bombing, to which Worman points, goes to the *weight* of the evidence, not its admissibility.

### c.    Summary

Upon the foregoing, the prosecution's July 24, 2008, Motion For Pretrial Determination Of Admissibility Of Evidence Regarding Defendant's Prior Conduct (docket no. 21) will be granted as to evidence of angry, hostile, or temperamental interactions between Worman and Torkelson and evidence of Torkelson's involvement with Worman's termination. On the other hand, that motion will be denied as to evidence of Worman's purported angry, hostile, or temperamental interactions with co-workers in general.

## C. Evidence Of Torkelson's Extramarital Affairs

The prosecution's second pretrial evidentiary motion is its August 5, 2008, Motion In Limine Regarding Paulette Torkelson's Extramarital Affairs (docket no. 24). Analysis of this motion also requires review of some additional factual background.

### 1.    Additional factual background

The prosecution contends that Torkelson admitted to postal inspectors during an interview on July 5, 2005, during the investigation of the pipe bomb incident, that she had had at least three extramarital affairs over the last thirty years. More specifically, the postal inspectors' report describes Torkelson's statement about the affairs as follows:

> When asked about her relationships in the past, Ms. Torkelson stated three former friends were still in the area. She stated Gerald Bowman was the former CEO of Winnebago and is married to the daughter of Winnebago's founder. She stated

they had a 5 year relationship which ended about 10 years ago. Ms. Torkelson stated that he has tried to rekindle things within the last year, but she just tries to avoid him. She stated that she did not think Gerald would try to harm her.

Ms. Torkelson stated another gentleman she was involved with was Larry Richmeyer. She stated Larry was not married and has tried to rekindle things but she just passed it off as a joke. She stated Larry made comments to her a few weeks ago but did not seem upset when she turned him down. She further stated she and Leslie [her husband] consider Larry a friend. Ms. Torkelson stated a third friend who was Larry Kinseth. She stated Larry is married, lives in Belmond and she has had no recent contact with him. She further stated Larry had been away from Forest City for [a] long time, but would have divorced Leslie for him when her daughter was 13 years old. She added her daughter made her promise not to leave and she put an end to the 5 to 10 year relationship with Larry.

Worman contends that Torkelson's affair with Bowman gave her undue privileges and authority at Winnebago and that Torkelson had a reputation for stepping on people and sleeping with upper management to assure her job security. Worman contends that, after Torkelson's affair with Bowman ended, Torkelson was demoted and transferred to an hourly wage position. Ultimately, in 2004, Torkelson was transferred to the Stitch Craft Division of Winnebago as an hourly employee. Worman contends that, when Torkelson retired in 2008, she was not allowed to return to the plant, which Worman contends further suggests her loss of influence and authority.

### 2. *Arguments of the parties*

The prosecution contends that evidence of Torkelson's extramarital affairs should be excluded or limited pursuant to Rules 608, 403, and 611 of the Federal Rules of Evidence. More specifically, the prosecution argues that Worman should be precluded

from cross-examining Torkelson about her extramarital affairs by Rule 608, because Torkelson's infidelity is not relevant to her character for truthfulness as a witness. The prosecution also contends that extrinsic evidence of Torkelson's affairs cannot be used to prove a character trait and that the purpose of the rule is to avoid holding mini-trials on peripheral or irrelevant matters. In short, the prosecution argues that Torkelson's infidelity is too old and too unrelated to her veracity or to any other issue in the case to constitute an acceptable subject for cross-examination pursuant to Rule 608.

Next, the prosecution argues that evidence of Torkelson's extramarital affairs should be excluded pursuant to Rule 403, because infidelity is not probative of truthfulness and the only other purpose of such evidence would be to introduce speculation that someone connected with Torkelson's extramarital affairs sent her the pipe bomb. The prosecution contends, however, that there is no evidence whatsoever that anyone involved in Torkelson's affairs committed the offenses with which Worman is charged, so that admission of mere speculation about a third-party perpetrator, based on Torkelson's extramarital affairs, would only prejudice and mislead the jury, while wasting time. The prosecution points out that there is no evidence that any of the men involved in Torkelson's former affairs, their wives, or her husband had a motive to send Torkelson the pipe bomb. Although the prosecution concedes that there were affairs, the prosecution points out that there is no evidence that the affairs ended acrimoniously, with vindictive conduct, or even with hard feelings. The government also points out that Torkelson's husband is aware of the affairs and has reconciled with Torkelson. Finally, the prosecution asserts that there is no evidence that any of the people involved in or affected by Torkelson's extramarital affairs had the knowledge or inclination to create a pipe bomb, so that there is simply no evidence or testimony linking any of them to the pipe bomb recovered in this case. Thus, the prosecution contends that only speculation or conjecture, not evidence, suggests that

anyone involved in decades-old affairs was involved in sending Torkelson a pipe bomb in 2005.

Finally, and in the alternative, the prosecution argues that cross-examination of Torkelson concerning her infidelity should be limited pursuant to Rule 611 to prevent harassment or embarrassment. The prosecution points out that questioning Torkelson about her affairs would embarrass and harass her, and unfairly prejudice the jury against her, without providing the jury with any real substantive evidence. If any questioning at all is permitted on this issue, the prosecution argues that such questioning should be limited to the bare essentials of who and when, rather than details of the affairs or other aspects of Torkelson's personal life. The prosecution also asserts that the court should require Worman to tie his questioning on this topic to his theory of admissibility, whether veracity of the witness or third-party guilt. The prosecution argues that the court should remember that Torkelson is the victim of the crimes charged and that she should not suffer further victimization at the hands of the defendant through cross-examination.

Not surprisingly, Worman has a much different view of the admissibility of evidence of Torkelson's extramarital affairs. He contends that excluding evidence of Torkelson's affairs would violate his Sixth Amendment right to a fair trial and Fourteenth Amendment right to due process. He contends that he has a well-settled right to introduce evidence tending to prove that another person may have committed the crimes with which he is charged. He asserts that such evidence should not be excluded on the basis of the strength of the prosecution's case. Here, he contends that evidence of Torkelson's extramarital affairs is relevant and, indeed, postal inspectors asked her about them, because such relationships clearly provided a motive for sending Torkelson a pipe bomb. Worman cites cases holding that evidence of extramarital affairs is relevant to proof of motive for and intent to commit murder. Worman argues that the evidence of Torkelson's

extramarital affairs establishes that others had stronger motives to send Torkelson a message or to try to kill her with a pipe bomb than he did.

In reply, the prosecution argues that Worman incorrectly asserts that he is entitled to introduce any evidence tending to prove that another person may have committed the crime with which he is charged. Rather, the applicable standard requires the court to examine whether the evidence sufficiently connects the other person to the crime.

### 3.    *Analysis*

Worman apparently eschews any attempt to inquire into Torkelson's extramarital affairs to impeach her truthfulness, relying, instead, on the relevance of the evidence to suggest the possible guilt of a third party. Thus, the court believes that the admissibility of this evidence turns on the limitations on third-party guilt evidence and the requirements of Rules 403 and 611, rather than on the limitations of Rule 608.

The Eighth Circuit Court of Appeals long ago recognized,

> 'While it is competent for the defendant to show, by any legal evidence, that some other person committed the crime with which he is charged, and that he is innocent of any participation in it, such evidence must tend to connect such other person with the commission of the crime charged. An examination of the authorities will show that it is generally held that evidence which could have no further effect than to cast a bare suspicion upon another is incompetent and inadmissible.' *Irvin v. State*, 11 Okl.Cr. 301, 146 P. 453.

*Hale v. United States*, 25 F.2d 430 (8th Cir. 1928). The United States Supreme Court has much more recently identified similar formulations of the "widely-accepted" rule that a defendant may attempt to show that someone else committed the offense with which the defendant is charged. *See Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) ("Evidence tending to show the commission by another person of the crime charged may

be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded,"41 C.J.S., *Homicide* § 216, pp. 56-58 (1991); and "[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged. . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial," 40A AM.JUR.2D, *Homicide* § 286, pp. 136-138 (1999) (footnotes omitted)). Thus, "'there is no doubt that a defendant has a right to attempt to establish his innocence by showing that someone else did the crime.'" *United States v. Jordan*, 485 F.3d 1214, 1219 (10th Cir. 2007) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998)). Even so, "courts may properly deny admission of alternative perpetrator evidence that fails to establish, either on its own or in combination with other evidence in the record, a non-speculative 'nexus' between the crime charged and the alleged perpetrator." *Id.*

The court accepts that evidence of the extramarital affairs of a target of a violent crime is relevant to the question of who had a motive for such a crime. *Cf. United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir. 1992) (evidence of the defendant's extramarital affairs was admissible to show his motive for killing his wife); *Knapp v. White*, 296 F. Supp. 2d 766, 775 (E.D. Mich. 2003) (testimony concerning a defendant's extramarital affairs was relevant to his theory of the case that his former paramour and the victim's mother conspired against him to make false accusations); *United States v. Stapleton*, 730 F. Supp. 1375, 1378 (W.D. Va. 1990 ("It is generally recognized that an adulterous relationship, particularly when it is clandestine, is evidence of possible strong motives for murdering the cuckolded husband."). Indeed, the postal inspectors' inquiries into whether

Torkelson had had any extramarital affairs is an acknowledgment that such conduct might have given someone involved in or affected by the affairs a motive to send Torkelson a pipe bomb. Nevertheless, millions of affairs end without anyone being sent a pipe bomb. Moreover, the court also acknowledges the prosecution's contention that, at this point, there is no evidence that any of Torkelson's extramarital affairs ended acrimoniously, or have caused a continuing riff or animosity between Torkelson and her spouse or any other person; no evidence, so far, that any of the people involved in or affected by Torkelson's extramarital affairs had the knowledge to create a pipe bomb; and no evidence, so far, connecting any such persons to the pipe bomb involved in this case. The court does not find the prosecution's contentions dispositive of the admissibility of evidence of Torkelson's extramarital affairs, however.

Although it is a very close call, the court finds that Worman relies on no more than speculation that some unknown third party might have sent Torkelson the pipe bomb by identifying a group of persons who could reasonably have a motive for doing so, based on their involvement in or the effect on them of Torkelson's extramarital affairs. *See Hale*, 25 F.2d 430 (there must be evidence connecting the alleged third-party perpetrator to the crime, not mere speculation); *Holmes*, 547 U.S. at 327 (same); *Jordan*, 485 F.3d at 1219 (same); *McVeigh*, 153 F.3d at 1191 (same). More specifically, the court finds that a demonstration of possible motive for sending a pipe bomb to Torkelson from the circumstances of Torkelson's extramarital affairs is not, by itself, sufficient to establish the required "nexus" or "connection" between those involved in or affected by her affairs and the charged crimes, in the absence of other physical or circumstantial evidence of actual involvement of any such persons in sending the pipe bomb. *See id.* 25 F.2d 430; *Holmes*, 547 U.S. at 327; *Jordan*, 485 F.3d at 1219; *McVeigh*, 153 F.3d at 1191. In the court's view, the prosecution's complaints about the insufficiency of the evidence of extramarital

affairs to establish an inference of third-party guilt go to *both* the *weight* of the evidence and its admissibility.

The Rule 403 balance of probative value against potential for prejudice of this evidence, as it now stands, is also a close call, because the probative value of the evidence would obviously be greater if some of the missing elements that the prosecution cites were present, and there is undeniably some potential for prejudice from allegations of infidelity, which may provoke some jurors to dislike Torkelson or to disregard other issues in the case. *See* Fed. R. Evid. 403, Advisory Committee Notes (describing decision on an "improper basis" as "commonly, though not necessarily, an emotional one"); *Adams*, 401 F.3d at 900 (describing unfairly prejudicial evidence as evidence that is "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.") (internal quotation marks and citations omitted). Thus, the court will require something to tilt the balance in favor of admissibility, even if the evidence in question is properly limited pursuant to Rule 611. *See also* Fed. R. Evid. 611(a) (the court shall exercise reasonable control over the mode of interrogation and the presenting of evidence to make the presentation effective for ascertaining the truth, to avoid needless consumption of time, and to protect witnesses from harassment or undue embarrassment).

Consequently, to satisfy the requirements for third-party guilt evidence and to tilt the Rule 403 balance in favor of admissibility, Worman will not be allowed to broach the subject of Torkelson's extramarital affairs until and unless some evidence is generated, *in addition to evidence of the extramarital affairs*, showing, however tenuously, that a person involved in or potentially affected by Torkelson's extramarital affairs was connected in some way with the commission of the crime charged. *Hale*, 25 F.2d at 430 (third-party guilt evidence "must tend to connect such other person with the commission of the crime charged," and must do more than "cast a bare suspicion upon another"); *accord Holmes*,

547 U.S. at 327 (citing authorities requiring a similar "connection"); *Jordan*, 485 F.3d at 1191 (requiring some "non-speculative 'nexus' between the crime charged and the alleged perpetrator").

Even if Worman makes the necessary showing, the court finds that appropriate limitations on the extramarital affairs evidence are required pursuant to Rule 611. The prosecution suggests, for example, that any examination about Torkelson's extramarital affairs should be limited to the bare essentials of who and when, but should not be permitted to delve into details of the affairs or other aspects of Torkelson's personal life. In the court's view, however, such limitations are unlikely to permit Worman a fair opportunity to develop evidence that might reasonably suggest that a third party involved in or affected by one of Torkelson's extramarital affairs could have sent Torkelson the pipe bomb. At a minimum, Worman should also be permitted to inquire into and offer any evidence concerning whether Torkelson's affairs engendered animosity or threats from anyone involved in or affected by them, including who knew about them, the terms on which they ended, and whether there were attempts on either side, thwarted or otherwise, to rekindle the affairs at a later date, such as around the time of the attempted pipe bombing. Some evidence suggesting that a person involved in or affected by Torkelson's extramarital affairs had both a motive to hurt her and some connection to the crime charged will not, however, open the door to evidence of Torkelson's extramarital affairs generally. Rather, the evidence must remain focused on persons involved in or affected by *a particular extramarital affair* as to whom some connection to the charged crimes can be shown. The court also asks the parties to offer any suggestions that they may have concerning ways in which the potential embarrassment to third parties arising from inquiry into Torkelson's extramarital affairs can be limited while still affording the defendant fair scope to probe the pertinent issues in a public trial.

In short, the prosecution's August 5, 2008, Motion In Limine Regarding Paulette Torkelson's Extramarital Affairs (docket no. 24) will be denied, as to exclusion of evidence of Torkelson's extramarital affairs pursuant to Rules 608 and 403 of the Federal Rules of Evidence. Worman is not thereby given free rein to delve into all aspects of Torkelson's extramarital affairs or Torkelson's personal life, however. Rather, before Worman is allowed to broach the subject of Torkelson's extramarital affairs, some evidence must be generated, *in addition to evidence of the extramarital affairs*, showing, however tenuously, that a person involved in or potentially affected by Torkelson's extramarital affairs was connected in some way with the commission of the crime charged. Also, the court will grant the prosecution's alternative request that the court exercise considerable control, pursuant to Rule 611, over the nature and scope of the permissible inquiries into Torkelson's extramarital affairs.

### D. Evidence That Mrs. Worman Blamed Torkelson For Worman's Termination

The last evidentiary motion now before the court is the prosecution's August 6, 2008, Motion In Limine To Admit Statements By Witnesses That Shirley Worman Blamed Paulette Torkelson For Defendant's Termination From Winnebago (docket no. 25). Analysis of this motion also involves review of some additional factual background.

### 1. Additional factual background

The parties agree that, at the time that Torkelson was transferred to the Stitch Craft Division of Winnebago Industries, a year or so before the pipe bomb was sent to Torkelson, Worman's wife, Shirley Worman, also worked in that division. The prosecution anticipates that Stacey O'Neill, Patricia Tendall, Randy Weiland, and Terry Tweeten will all testify at trial that Mrs. Worman blamed Paulette Torkelson for Worman's

termination from his employment at Winnebago. More specifically, in an interview on April 3, 2008, with an FBI agent and a postal inspector, O'Neill stated that she had been working with Mrs. Torkelson at Winnebago since late 2004 or early 2005 and that Mrs. Worman told her on at least three different occasions that Torkelson got Worman fired. Similarly, in an interview with postal inspectors on July 7, 2005, Patricia Tendall stated that she had worked for Winnebago for more than thirty years, that Mrs. Worman worked at the Stitch Craft Division of Winnebago before Torkelson was transferred there, that Mrs. Worman was unhappy that Torkelson had been transferred to that division and was not sure that she would be able to work with Torkelson "because of John," and that Mrs. Worman had told her that Worman was fired from Winnebago because of Torkelson. Randy Weiland also was interviewed by postal inspectors on July 10, 2005, at which time he worked with Mrs. Torkelson in the Stitch Craft Division. Weiland also stated that Mrs. Worman blamed Torkelson for Worman losing his job, although Weiland thought that Mrs. Worman had gotten over her grudge after "a year or so." Nevertheless, Weiland told inspectors that Mrs. Worman had said that "things would be interesting when [Torkelson] was transferring to Stitch Craft" and that Worman's termination was a "sore subject" for a time with Mrs. Worman. Finally, Terry Tweeten, who was Torkelson's supervisor in 2005 told investigators in an interview in 2005 that Mrs. Worman and Torkelson did not get along, because Mrs. Worman blamed Torkelson for Worman's termination, and that Mrs. Worman had made comments about Torkelson in the past.

### 2. *Arguments of the parties*

The prosecution contends that statements of various persons that Mrs. Worman blamed Torkelson for Worman's termination from Winnebago are not excludable hearsay pursuant to Rule 801(c), because they are not offered for their truth. Indeed, the prosecution argues that it is irrelevant to its case whether Torkelson was actually

responsible for Worman's termination from Winnebago. For purposes of this motion, at least, the prosecution maintains that Worman was not fired, but resigned, and that the decision to demote Worman that triggered his resignation was made by corporate officers higher in the chain of authority at Winnebago than Torkelson. Thus, the prosecution argues that the statements are admissible to prove that Mrs. Worman blamed Torkelson for Worman's termination. The prosecution also argues that Mrs. Worman's statements are relevant to prove Worman's motive and, therefore, are admissible under Rule 401. The prosecution asserts that Worman and his wife undoubtedly talked about the reason why he was fired; thus, Mrs. Worman's beliefs about why her husband was fired likely are reflective of what her husband told her about the incident and his belief that Torkelson was responsible for his termination. Furthermore, the prosecution argues, Mrs. Worman's conflict with Torkelson would have been an additional motive to harm Torkelson. The prosecution also argues that the conflict between Torkelson and Mrs. Worman would have been a reminder to Worman of his termination from Winnebago, which would explain why he still held a grudge over the incident years later.

Worman contends that this evidence is not admissible. First, Worman contends that admission of evidence that his wife told witnesses that she believed that he was fired from his job at Winnebago because of Torkelson would violate his Sixth Amendment Right to confront and cross-examine witnesses. He contends that the prosecution is attempting to have his wife testify through third parties, because she cannot be compelled to testify against him. Next, Worman argues that introducing his wife's alleged statements through third parties would violate the hearsay rule, because in every case cited by the prosecution, the statements were attributable to either the defendant or the victim, not to a third party, such as the defendant's wife. Worman also argues that his wife's opinions as to Torkelson's responsibility for his firing are simply not relevant, because her opinions are

too remote and speculative a basis to show what his own opinions might have been, for example, where both worked at Winnebago and did not necessarily have the same sources of information to form their opinions. Worman argues that there is no showing that his actions had any basis in his wife's opinion as to how his employment at Winnebago ended. Finally, Worman argues that, if the statements in question are somehow relevant, they are highly prejudicial, because they would create a "trial within a trial" concerning whether or not he was fired or resigned, and there are many breaks in the chain of inferences necessary to show that he had a motive to hurt Torkelson based on testimony about his wife's supposed statements. Worman also argues that evidence of these statements will sidetrack the jurors from consideration of ultimate issues in the case.

### 3.    *Analysis*

Rule 802 of the Federal Rules of Evidence provides that hearsay generally is not admissible. Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Here, the court cannot tell from present submissions whether or not the witnesses' statements about what Mrs. Worman said, out of court, are or are not hearsay. For example, if a witness testifies, "Mrs. Worman said, "I blame Torkelson for my husband's termination from Winnebago,'" then the statement *is* offered for its truth, that is, that Mrs. Worman did blame Torkelson for her husband's termination, and the statement is, therefore, hearsay. *See* FED. R. EVID. 801(c). On the other hand, if a witness testifies, "Mrs. Worman said, 'Torkelson is responsible for my husband's termination from Winnebago,'" the statement is *not* hearsay, because it is not offered for its truth, that is, that Torkelson is responsible for Worman's termination from Winnebago, but for Mrs. Worman's belief about what happened.

Yet, even if the statements of these witnesses concerning what Mrs. Worman said or believed were otherwise admissible over hearsay or other objections, the court finds that they are inadmissible pursuant to Rule 403. First, they are, at best, only marginally probative of any issue in the case, because what a defendant's wife thinks or believes provides little or no insight into what the defendant thinks or believes. Moreover, such statements are only minimally suggestive that a "conflict" between Mrs. Worman and Torkelson established a motive for Worman to send Torkelson a pipe bomb or that Worman still held or had reason to renew a grudge against Torkelson. Second, the statements are substantially more prejudicial than probative precisely because they would invite a jury to attribute or transfer Mrs. Worman's supposed animosity toward Torkelson to Worman in the absence of any evidence of Worman's own mental state, intent, motive, or involvement in the pipe bombing. *See* FED. R. EVID. 403, Advisory Committee Notes (describing decision on an "improper basis" as "commonly, though not necessarily, an emotional one"); *Adams*, 401 F.3d at 900 (describing unfairly prejudicial evidence as evidence that is "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial."). Furthermore, such evidence would invite a mini-trial on whether or not Mrs. Worman blamed Torkelson for Worman's termination from Winnebago and whether Worman shared her belief, distracting the jurors from evidence that is likely to be far more probative of Worman's own mental state and involvement (or lack of involvement) in the pipe bombing. *See id.* (the court may also exclude relevant evidence if its probative value is outweighed by the danger of confusion of the issues, misleading the jury, considerations of undue delay, or waste of time).

Therefore, the prosecution's August 6, 2008, Motion In Limine To Admit Statements By Witnesses That Shirley Worman Blamed Paulette Torkelson For Defendant's Termination From Winnebago (docket no. 25) will be denied.

### III. CONCLUSION

Upon the foregoing,

1.      The court holds, *sua sponte*, that neither the parties nor any witnesses may refer to or describe Torkelson as "the victim" or "the intended victim," although the parties and the witnesses may refer to Torkelson as "the intended recipient" or "the target" of the pipe bomb at issue in this case;

2.      The prosecution's July 24, 2008, Motion For Pretrial Determination Of Admissibility Of Evidence Regarding Defendant's Prior Conduct (docket no. 21) is **granted** as to evidence of angry, hostile, or temperamental interactions between Worman and Torkelson and evidence of Torkelson's involvement with Worman's termination, but **denied** as to evidence of Worman's purported angry, hostile, or temperamental interactions with co-workers in general;

3.      The prosecution's August 5, 2008, Motion In Limine Regarding Paulette Torkelson's Extramarital Affairs (docket no. 24) is **denied** as to exclusion of evidence of Torkelson's extramarital affairs pursuant to Rules 608 and 403 of the Federal Rules of Evidence, but Worman must make the showings required herein before broaching the subject of Torkelson's extramarital affairs, and the prosecution's alternative request that the court exercise considerable control, pursuant to Rule 611, over the nature and scope of the permissible inquiries into Torkelson's extramarital affairs is **granted**; and

4.     The prosecution's August 6, 2008, Motion In Limine To Admit Statements By Witnesses That Shirley Worman Blamed Paulette Torkelson For Defendant's Termination From Winnebago (docket no. 25) is **denied**.

**IT IS SO ORDERED.**

**DATED** this 25th day of September, 2008.

_Mark W. Bennett_

_____

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA